thank you. Good morning, your honors, David Stoyer from Mylan. The decision below, sustaining against challenges of invalidity and obviousness, the Chang patent was based on the 30-10 ratio of immediate and delayed-release pellets in the formulation. The evidence below demonstrated clearly and convincingly that the ratio was inherently anticipated or alternatively obvious, and the court's contrary ruling was error. However, the court further found that three individuals, all of whom under oath denied inventing this ratio, are nonetheless properly deemed inventors of the same ratio they denied inventing, which constitutes the novelty as found by the district court of the invention. On that one particular point, you asserted and cited something, I think, for the proposition that the ratio, you said, was identified before the development of the data. And I looked at the citation, and it seems to me it just didn't say that at all. And without that, I don't see how your 102-F argument even begins. Well, I don't think that's exactly what the inventorship issue was. The inventorship issue was that Shire, the company, was hired to formulate this drug using what they call the micro-tall technology, and they asked a team of scientists to work on it. And they ran simulations not including the one that was actually in the invention. They ran 80-20, 85-15, and 90-10. And they gave that data to Collagenics, and Collagenics, which is not named as the inventor, came back to them and said, we want you to do 75-25, which is the 30-10 when it's used in a 40-milligram formulation. And all of the inventors denied that they, in fact, had invented this 30-10 ratio. And this is the only element that the judge identified as being absent from any of the other prior art references to sustain the validity of the patent. So, at the same time, the 30-10 is critical to the anticipation and obviousness findings. But yet, when these same inventors say that they were not the inventors of this particular ratio, the court decided to discount their testimony, which was never impeached. The only, and in fact, the court in its findings cited testimony. I guess I just want to focus. So, you say, instead, the secret sauce ratio was previously conceived, previous meaning before all of the three named inventors did their experiment, by an unnamed individual at Collagenics. And you cite 93-14 of the appendix. That just doesn't say it was previous. And it seems to me, if it's after, if all the experiments were done, and they produce a bunch of data, and it includes a number of ranges, and in the report they even say, you know, maybe actually 75-25, I don't know what your argument is. But, Mr. Schroeder, I think I was unclear in the briefing, and I apologize for that. What my point, what I was trying to make is that Collagenics, the company, the unnamed inventor, had determined the ratio and had given it to Shire. Before or after all of the data were produced? Well, there never was. The data that was produced was not on this formulation. The data referred to other ratios. Those, that data was given to Collagenics, and Collagenics said, no, use this ratio in a further study. And, in fact, the inventors never ran that ratio. The inventors never ran that ratio. At that point, the project transferred to a company that did what they called a pivotal PK test. But, in fact, the specific ratio was neither suggested by, nor even done in computer simulation in silico by the named inventors. And, in fact, the plaintiffs didn't actually even rely on the testimony of the inventors. They relied on a document that I do want to cite to the court. It's at A11528, and it's the document where Shire says, perhaps you could try 7525. But the interesting thing about that document, and I don't know if perhaps is an invention, but Dr. Chang stated expressly he had nothing to do with that document, and that's at A9309. So, the one document they point to has actually no connection to the named inventors in this about the specific ratio. Now, with respect to our anticipation arguments on the 932 application, which incorporated another application, the 854, and the only real element that would be missing from that, I think it's fair to say, would be the express definition of the 30-10 ratio. It gives 40 milligrams. It gives doxycycline. It gives immediate release and delayed release. It doesn't have the specific 30-10. It does have a ratio, at least 50 percent, preferably more than 80 percent immediate release. But it turns out that it gives the target blood concentration. I don't remember the specific language. Does it say immediate release, or does it say sustained release? What it does, it has three different types of releases that it says. You can use all three of them, or a combination. Immediate release, delayed release, and sustained release. I think you said, and I think your brief says, or your briefs say six or seven times, that it spoke specifically about a, what, 20-80, 80-20 or something, a range as to immediate release with whatever wasn't the immediate release presumably being delayed release. It seems to me, and tell me if I'm just wrong in having checked this, that what you cite is talking about sustained release every time that there's talk about numbers, that it's not talking about immediate release, delayed release. Did I just miss something? First of all, when you get to 20-80, I wonder if you're thinking of the 304 patent, which is the minocycline patent, which is only immediate release and delayed release, which is relevant to the topic. I'm talking about the two Ashley applications. Yes, with respect to the Ashley applications, they always list three different types of formulations, immediate release, delayed, sustained, or combinations. And so this is one of the combinations. For example, if you look at the 854 application, Claim 7, which pens from Claim 1, it's specifically a combination of these three elements, any combination that achieves the blood range, which is, of course, the same blood range that we find, the PK range that's in the Chang patent. So there's seven different type combinations of those three things, immediate, delayed, and sustained. And that's just type combinations. And then there's any number of different amounts for the particular components. So we're starting to talk about a significant number of possibilities with what reason to conclude that, in KSR terms, any given one of them would have had some reasonable expectation of success. Very well, Your Honor. I would say that there's actually only one possibility because they give the blood chemistry. It has to be between certain points of presence in the bloodstream. And this is doxycycline. It's a 50-year-old drug. It's a linear connection between dosage and presence in the blood. And it tells you exactly what the blood concentration has to be. So once you know that, as Dr. Chang himself said, anyone in the business can figure out how to get it. It's like a homework project. That testimony, which, again, you cite a number of times, seemed to me sort of a perfect example of it's not entirely clear what he was saying. And if the district court had interpreted it your way, it would be hard to say, no, that's wrong. But I think it's equally hard to say that the district court's contrary interpretation is wrong. It's a little bit, more than a little bit, ambiguous what he's saying. What is there that led to, that created a reasonable expectation of success in producing the right blood concentration level over an extended period of time from this particular combination of IRDR? All right. I would say there are three things. Certainly there are the applications. You have a similar drug, another tetracycline drug, minocycline, in the 304 patent, that used only these two to get a daily dosage that maintained a specific level over time. And what's the basis for an expectation that what was true of minocycline would be true of doxycyline? Well, that's a good question. In fact, these are tetracyclines, and the Chang patent itself states that what it says about doxycycline could apply to any other tetracycline. In fact, you can find that at, let me try to find that. I mean, there really aren't, there really isn't a range of different, what was the language, absorption windows for different tetracyclines. No, and in fact, Chang himself says that you can use this for other tetracyclines. It's a, people, this is an old drug. It gets absorbed in the duodenum, which is what it's called, from minocycline, all the tetracyclines get absorbed. And there's just no mystery about this drug. It's an old drug. And it was first characterized in terms of its pharmacokinetic characteristics over 40 years ago. And there was no new information. There's no one who, doctor, there was, they said there was a shock that they could get to this result. I understand that they said that. But there's nothing unexpected about it. In fact, I think a good comparison would be the Allergan Watson Florida case, which was, they used the same technology, which is this microtrol technology, to do trospium salts. And in that case, they didn't even have suggested ranges, which we've seen in the 304. They looked at the 819 patent, which was Dr. Chang's earlier patent for microtrol, which was for amphetamines. And the court said, this is obvious, and this court affirmed it under Rule 36. And I think if you compare the formulation in that case to the formulation in this case, which I think is, in fairness, a routine application of previous knowledge about tetracycline antibiotics, that the Chang patent is much more obvious than the trospium salt patent. So I think there's not only every expectation of success. I think in light of the linear nature of the pharmacokinetics on doxycycline, the previous success in the minocycline patent and the 819 patent itself, the court below said that you wouldn't look to the 819 patent because it's a different drug. But Dr. Chang himself, when he was mapping out the strategy for doing this, himself cited the 819 patent. And I can give you a cite of that, which is, I believe I can give you a citation to that. That would be at 11.518, where he said he would use microtrol and the 819 patent, as well as two other patents, which were actually discussed below. On the issue of obviousness, so how do you see that the claimed IR and the DR strategy of the Chang patent is obvious when the absorption window was not known to one ordinarily skilled in the art? The absorption window was, in fact, known to one skilled in the art. The only evidence that they had of knowledge that was acquired about the absorption window, which was in the duodenum, which was known since the 60s, was they did an experiment after the application of the patent, but there was no new knowledge at all, Your Honor, about how doxycycline is absorbed in the body. That's well known. As a physical matter, and I don't know if this is even going to be an intelligent question, but if you put in the pill 75 milligrams of the immediate release and 25 milligrams of the delayed release, are those two different classes of pellets absorbed at different places in the body? Does all the immediate release get absorbed up in the upper GI tract, and then the delayed release proceeds to the lower intestine, or does the delayed release stay in the upper but just take longer to release? The delayed release takes longer to release. So the delayed release is not absorbed as much, frankly. It doesn't have the same absorption as the immediate release. But such absorption as occurs for all of it is occurring in the same place in the body? Principally in the same place. The duodenum takes up almost all of the absorption of the doxycycline. The delayed release will go down a little further because it's delayed, and the absorption rate in the lower part of the intestine is not as much as the duodenum. And that's how you avoid what they call the C-max, because some of that stuff gets absorbed later and not as much. This is basically a pill that's overwhelmingly 75% immediate release. So it doesn't vary really that much from just a 40-milligram pill of doxycycline. Okay. Now you've exhausted most of your rebuttal time. Do you want to save the 32 seconds for the last one? Thank you, Your Honor. I will. Good morning, Your Honors. Mr. Flapman. I'm Charles Flapman on behalf of CalDERMA in this case. I'll start by addressing the Chang issues, if I may. Okay. Your Honor, the district court's decision was based on detailed findings of fact in his opinion and a careful evaluation of the testimony and the credibility of the experts at trial, and it shouldn't be disturbed here. The appellants really have to recreate the prior art and the district court's legal analysis in order to mount an appeal on Chang. Regarding the art, the court clearly found that the Ashley art did not teach any immediate release, delayed release formulation. But it does teach a controlled release strategy, correct? It teaches what it calls a sustained release strategy. And if you go through the Ashley reference, you'll see that it refers at least six times to maintaining a substantially constant rate of release. This was discussed by Dr. Rudnick at the trial and by Dr. Friend. But the release is controlled? It's sustained. It's controlled in the sense that it's sustained as a constant rate throughout the body. That's the opposite strategy of the Chang inventors. Why isn't that just another embodiment of the Chang 30-60 ratio, 30-10 ratio? Oh, because Chang would not result in a substantially constant rate of release with the 3 to 1 IR to DR ratio. That was found by the district court in its opinion, and it was also discussed by both experts and admitted by Milan's expert at trial. It wouldn't be sustained, but it would be a controlled release. Controlled in the sense that Chang was having a certain amount of immediate release at the beginning of the process and then delayed release subsequently. That's true. Okay. But that's not what was contemplated by the Ashley application, and the court so found. The court found that the Ashley application did not contemplate any immediate release, delayed release strategy. It was a sustained release strategy of substantially constant release, which would not have worked to solve the problem that the Chang inventors were dealing with. What do you make? Don't tell me what the district court said, but what do you make of the passage in one or the other of the Ashley applications that talks about any of the seven possible combinations of immediate, delayed, and sustained release? I think that's a wish for a solution, Your Honor. That's basically saying there's a problem out there. I'd like to create a solution for this problem of maintaining a sub-antibacterial amount that's still effective for Azacia, and, hey, I might use any number of possible combinations, immediate release, delayed release, sustained release, in any number of possible ratios, but I don't know what they are. So it's a little bit like the cyclodenzaprine case that this court recently decided, where essentially you've got a wish or a recognition of a desire to solve a problem, but not a recognition of how to achieve it. It's the metaphorical dartboard, and they're throwing darts at it here, and they have to recreate problems. Yeah, but the difference in this case is that we know that the way to address the issue is through a controlled release of some kind. I don't know the ratios, but is your argument that the ratio range is so vast that one of ordinary skill in the art could not have achieved the 30-10 ratio of the Chang-Pan? They wouldn't have even known to start with immediate release, delayed release components. The testimony at trial was that they would have started with sustained release components, just sustained release components, which is an entirely different formulation strategy. There are a number of different ways to make once-a-day drugs. They're not all the same. Some require immediate release. Some require a combination of elements. Some require sustained release. For this particular drug, the real innovation was realizing that it required a combination of immediate release and delayed release elements. Was that achieved through routine testing? Oh, not at all. It was achieved through innovation and inventiveness. The art was teaching us to go the other way. If we look at the minocycline patent, for instance, that counsel talked about, the 304 patent, it was saying that if you used some kind of an immediate release, delayed release combination, you would achieve blood levels that didn't have a ceiling that could become antibacterial, both in the immediate release portion and the delayed release portion. And it didn't even provide any guidance as to what ratio to use. It suggested a 20 to 80 all the way to 80 to 20 range, which the district court and the witnesses at trial characterized as huge. Can I ask you something about the 304 patent you were just talking about? Of course. I had the impression that it didn't teach a way from staying away from some cap because it emphasized a good deal the value of avoiding fluctuations, which means staying away from being too low and staying away from being too high. And I guess I was concerned that the district court relied quite centrally on this teaching away notion that rested on the interpretation of the 304 as saying, oh, use as much as you want. And I don't see how that squares with the emphasis on avoiding fluctuation. Sure. Well, I think the puns mischaracterized to some degree that particular teaching of the 304 patent. What the 304 patent was saying in that passage about avoiding fluctuations was that it was important to avoid any drastic changes in the serum levels so as to avoid side effects. It didn't say that the serum levels should remain low. It didn't say that the serum levels should stay below any ceiling. There's no mention of any ceiling anywhere in that patent. In fact, the whole point of that patent was to provide high levels, antibacterial levels of minocycline. Opposite problem that was being dealt with by the Chang inventors. And the district court didn't just rely on that. It relied on the fact that the range was huge of IR to DR components. So huge as to be useless to anyone trying to solve this particular problem. Appellants talked about the microtraw technology in their argument as well, which I guess they're referring to the 819 patent. That didn't teach any range. It embodied a one-to-one IR to DR range, but didn't teach any three-to-one range. Which patent are you talking about? That's the 819 patent that they rely on. How about the 304 patent? The 304 was the one, Your Honor, we were talking about, which had the antibacterial effects. That does disclose a range, doesn't it, just like Chang? Excuse me, Your Honor? That does disclose a range of serum levels of one to one microgram per liter? Well, the 304 discloses a range of IR to DR of 20 to 80 to 80 to 20. So that's a vast range, and the experts at trial agreed on that, and the court so found. With microtraw, the 819 patent that was at issue in the Allergan case, there are a couple of very important distinctions. In Allergan, the claims at issue were broad and did not have any ratio, any limitation of components. They didn't have a three-to-one ratio, for example, like we have here. And they were dealing with a completely different technology for a different purpose. The microtraw patent is about using amphetamines, high levels of amphetamines that ramp up over time in order to treat ADD. So it's suggesting a completely different solution, high, no ceiling concentrations of drug for a completely different problem, treatment of a completely different disease. So what we really have here is a set of references, the Ashley references, which don't provide any solution to a problem. They just recognize that a problem might exist and it might be useful to solve. And we have other references that point in the other direction, away from the way that the Chang and Vanners go here. So based on those findings of fact and the credibility determinations that the district court met, that the district court arrived at, the decision should stand. I can turn briefly to the Ashley appeal, which is the appeal that we brought on Ashley patents, which are not the same as the Ashley applications that I've just mentioned. Is it up to you? You can use the time that you set aside for Mr. Tapia. Oh, absolutely. Either way. Yes. All right. Thank you, Your Honor. How do you intend to use the cross appeal or not? Well, Your Honor, if I have any additional time, I would love to address it. If you could take a couple of minutes and address it now, I will. Okay, Your Honor. I sure will. I will do so quickly. Okay. Your Honor, we appealed the district court's reinterpretation of the claim termed no substantial antibacterial activity. The court had originally construed that to mean no significant inhibition of bacteria. And then post-trial, the court applied it in a completely different way. Can I ask? Sure. I know you appreciate this problem. You actually agreed to the formulation of words constituting the claim construction that the district court articulated, right? Correct, Your Honor. And even in this court, you have not, in fact, as far as I can tell, unless it was so subtle I missed it, articulated a contrary claim construction. No. All you said is whatever the claim means, it can't possibly exclude this embodiment. You're absolutely correct, Your Honor. We still think that that first interpretation was correct. But what the court did here is the same as what happened in the AFT case. It dealt with the derivative claim construction in the post-trial phase and read out the word significantly. And in doing so, it basically read out the preferred embodiment, all of the test and specification, and all the admissions in the file wrapper. I guess I'm having trouble seeing how one treats your argument as a claim construction argument when you haven't said, here's the correct claim construction, and it's different from what the district court articulated. I understand the question, Your Honor. And the problem is that the correct claim construction is the one that the district court originally arrived at and originally applied at the PI stage. That included the preferred embodiment, and it was consistent with the specification. But in the post-trial phase, he looked at the extrinsic evidence, and he took the extrinsic evidence and reinterpreted the claim. And he applied it such that it no longer had the word significant in it. He basically required it to be impossible to meet negative limitations such that there was no inhibition of any bacteria at any time in any part of the body. That's not how this was described in the patent specification. So you're arguing an error in the application of the construction, right, not the construction itself. You did agree the parties stipulated to the construction. Yes. And the best way to phrase that, I think, is as this court phrased it in the AFT case. It's an erroneous derivative construction. So basically, the claim is properly construed, and then it was reconstituted in application in order to exclude the preferred embodiment. I'm sorry. While we're on Ashley, I need to ask this question. And it's related to both the Amin and the Ashley patents. If we agreed that there's no infringement of either one of them, why is there a live case or controversy about invalidity? I think the other side, Mylan, filed that as a cross-appeal contingent on a decision that there is infringement. They can correct me if I'm wrong. Maybe there's just an answer in our case law, and if you don't know. I mean, you have the generics file applications that say, this is the product that we want to market. Yes. Putting aside Chang, but as to Ashley and Amin, they can market it. Non-infringement. Why is there a live case or controversy about the validity of those patents? And if there isn't, why don't we just vacate the invalidity and the validity rulings on those two? I'm not entirely sure I understand, but I'll try. As to Chang, there's no issue because they admitted infringement. Right. Not putting aside Chang. As to Ashley, I'm cross-appealing the finding of no infringement, as I just argued. If I win on that, then their cross-appeal is live as to the validity of Ashley. Does that answer the question, Your Honor? No, I'm assuming you lose on that. Okay. If I lose on that, then you obviously don't need to research. And I realize they don't cross-appeal, or whatever it is, Ashley invalidity. The question is, why does that district court judgment stand when there's no case or controversy about it? It may not, Your Honor. I would have to research that. I didn't consider that. Okay. All right. Thank you. Thank you, Mr. Flatman. Mr. Zappia, whatever you need to tell us. Good morning, Your Honors. Andrew Zappia for Cross-Appeal at NYU. NYU has appealed the district court's findings on invalidity and non-infringement. I'd like to discuss the invalidity finding first. The district court used internally inconsistent reasoning to find all asserted claims of the MN patents and ballots without doing any analysis of the dependent claims. And despite its own findings of fact, which were inconsistent with the inherent anticipation finding. Now, the district court relied on four references, which we've called the high-dose references. Those teach 60 to 200 milligrams of tetracycline for rheumatoid arthritis and periodontitis. Now, there's no dispute that nowhere in those references is there any mention of NO or INOS expression. But it goes beyond that, Your Honors. In the district court's own findings of fact, paragraphs 231 through 233, which is on page 32 of the joint appendix, the district court found that there was no express or inherent disclosure of NO or INOS, no express or inherent disclosure of decreasing NO or INOS, and no express or inherent disclosure that the patients who were the subject of those references had elevated NO or INOS. Those findings of fact on page 32 of the joint appendix are inconsistent with the inherent anticipation finding. Now, the error of the district court on inherent anticipation becomes even more clear in the context of the dependent claims. As I mentioned, there was no analysis whatsoever of the dependent claims. And if you look at some of the dependent claims, just for example, claims 2 and 4 of 395 and claim 2 of the 775, they have an added limitation for substantially no antimicrobial activity. Now, these high-dose references teach 60 to 200 milligrams. The lower court found on page 842 of the joint appendix that 40 milligrams would inhibit the growth of microorganisms. Now, Your Honors, it's simply inconsistent for the district court to find that 40 milligrams inhibits the growth of microorganisms but then rely on these high-dose references to invalidate the dependent claims. And this really highlights the district court's error in invalidating dependent claims without doing any analysis whatsoever regarding whether the limitations of those dependent claims were in the prior art, whether expressly or inherently. Now, appellants, I think, recognize the problem with the inherent anticipation analysis because they turn to other references to try to get this court to uphold the invalidity finding, which we've called in our brief the low-dosage references, 40 milligrams per day. The problem is appellants' own position is that 40 milligrams per day would not decrease NO or INOS. And district court agreed. Appellants' own position is that 40 milligrams per day would have antimicrobial activity. The district court agreed. So it really doesn't make much sense to argue that these low-dosage references, which are 40 milligrams, can inherently anticipate. Now, we don't agree with those positions taken by appellants, but the issue here on inherent anticipation is proving by clear and convincing evidence that the limitations are necessarily present in the prior art. When appellants themselves question that fact, when the district court's own findings of fact are inconsistent with that, I don't think it's possible to say that these low-dosage references can support inherent anticipation. Now, Your Honors, on the issue of infringement, I was going to rely on my briefing on that and hold the remainder of my time for rebuttal unless the court has questions. Can I just ask you the same question that I asked your colleague about? On the assumption that there is not infringement of the amine patents, why is there still a case or controversy about the validity of the amine patents? I think my response on that would be the same as Mr. Flatman's, that I would have to consider that issue. I think the court indicated that if there were no infringement, that the invalid finding might be vacated in that respect. But I don't really, I can't say I know the answer to that question, Your Honor. OK. Thank you. Thank you, Mr. Zephyr. OK. Go ahead. Thank you, Judge Newman. I'll use my 32 seconds to try. I think we can try five minutes. Thank you. I do want to give some more citations to some of the questions from the court. With respect to the prior art, defining the doxycycline properties, at A15054 is an article, the Savin article, that describes both doxycycline and minocycline in the same article. And that's from 1988. In terms of the question that the court raised about whether this would be highly predictable, the Ashley application itself referred to the combinations as highly predictable. And that can be found at 11337, which is actually the incorporated 854 application at lines 10 to 14, where it refers to the combinations as highly predictable. In terms of the 304 patent, Mr. Flatman appeared to assert that it was not limited to a range. But I think that the patent actually does limit it to the range. And, in fact, this is the minocycline 304 patent. If you look at A14730 lines 3 to 5, the patent states that it does not want to get too high because it wants to avoid gastroirritability. So I do believe that practitioners looking at that would see that as a template for doing a similar delayed release, immediate release formulation for doxycycline, whose properties are really close to identical in terms of pharmacokinetics. And briefly on the amine patent and Judge Tarano's questions, from Mylan's perspective, Mylan just wants to sell the drug. So in terms of whether the court has to address both invalidity and infringement for these formulations, for these patents, is, from Mylan's view, Mylan's goal is just to sell the drug. And if it could sell the drug because it was the court rules that sustains infringement and doesn't address validity, Mylan's, frankly, indifferent to that. I will say that on the amine patent, they really are in the forms of a dilemma because if the lower-dose formulations are not anticipated, they're also on the record, certainly not infringed. But you could reach invalidity by looking at the corresponding effect 239, which states all the findings necessary to find that it can't be enabled. In fact, there was no evidence to show... Although that finding only talks about what the spec teaches. It doesn't talk about what the background knowledge of skilled artisans is, which can supplement what the spec teaches for enablement purposes. Well, that's true, Your Honor, but I think on this record, when no one could describe any evidentiary ability to show that there was this function of INOS expression at this lower dose, I don't think there's anything you could point at to in the record where you'd say someone in the art could create a physical fact that's not been demonstrated in this world yet. And cyclobenzaprine, which was cited by Galderma, is quite different because in cyclobenzaprine, it might have been just a wish that they didn't have the blood chemistry ranges and they didn't have, as the Ashley application said, the highly predictable nature of combinations of doxycycline. So I think cyclobenzaprine is quite a bit different from what a person skilled in the art would be looking at if they were trying to create this formulation in a doxycycline formula. And I thank the court for giving me a little extra time. Okay. Thank you. We didn't get to the cross-appeal, so I think we don't need the rebuttal. But thank you for being prepared. And the case is taken under submission.